**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Bankruptcy No. 24-80118 |
| | ) | |
| Blackhawk Valley Investments, Inc., | ) | Chapter 11 |
| | ) | |
| | ) | Judge Lynch |
| Debtor. | ) | |

# MEMORANDUM OPINION

Before the Court are the Debtor's objections to the claim of Creditor Blackhawk Stateline Storage, LLC ("BSS") that were not resolved by the Court's previous "Order Overruling in Part and Continuing in Part Objection to Claim." (ECF No. 100.)

This matter arises from the prepetition efforts of BSS to purchase the single parcel of real estate owned by the Debtor, Blackhawk Valley Investments, Inc. ("Debtor"), a 3-1/2 acre lot situated in South Beloit, Illinois. Following protracted negotiations, BSS asserts it held an enforceable contract, and later an enforceable settlement agreement, to acquire the property. But the sale never closed. After Debtor commenced this chapter 11 bankruptcy case in 2024, BSS timely filed a proof of claim in the amount of $65,000, alleging "Breach of Contract / Specific Performance for Real Estate / Enforcement of Settlement Agreement." (Claim 3-1.) BSS sought through its initial proof of claim either an order compelling Debtor to transfer the property or damages. Debtor objected, disputing there was an effective purchase contract or subsequent enforceable agreement. (ECF No. 56, the "Claim Objection.") Alternatively, Debtor argued that even if the Court were to find the parties had

entered into the alleged purchase agreement, the agreement had terminated by its own terms before the breach alleged by BSS would have occurred.

A trial was held at which the Court heard the testimony of the parties' witnesses. After considering and giving due weight to the evidence presented and the submissions and argument of counsel, for the reasons discussed below, the Court must sustain the Claim Objection in part and disallow the BSS claim, except for the amount that represents the uncontested tax payment made by BSS, which amount will be allowed as restitution.

## I. PROCEDURAL BACKGROUND

In its bankruptcy filings Debtor states that it is an Illinois corporation whose "physical address" is 231 Blackhawk Boulevard, South Beloit, Illinois. Michael Ryan, located in Herndon, Virginia, is its president and sole owner. The company's primary business activity involves its ownership of one parcel of commercial real estate located at the South Beloit address (the "Lot").

On January 26, 2024, Debtor commenced this case as a small business case under chapter 11 of the Bankruptcy Code. Debtor's schedules disclose its principal asset to be the Lot, which it describes as consisting of "Land + Buildings" valued at $125,000 and leased month-to-month to a single tenant for $650 per month. According to Debtor's schedules, no secured creditors have claims secured by the Lot.

BSS timely filed initial proof of claim for $65,000 based on "an Illinois state court complaint for specific performance, motion to enforce settlement agreement, motion to correct record, and a copy of a check." (Claim No. 3-1) Debtor objected to

Claim 3-1, and BSS amended its claim to add $23,167.26 in attorney's fees, increasing the claim to $88,167.26. (Claim No. 3-2.) The claim amendment did not address Debtor's objection. BSS alleges for its claim that Debtor agreed to sell the Lot, including both the land and buildings, to BSS for $35,000 in November 2019. It asserts that Debtor breached that agreement by failing to sell the property to BSS. In the alternative, BSS alleges that Debtor entered into a settlement agreement in November 2020 to resolve their dispute in which it agreed to sell the Lot for $75,000 but again failed to perform. BSS's proof of claim demands either an order compelling Debtor to transfer the property or money damages. Debtor disputes the amended claim arguing that the alleged 2019 agreement was never effective or terminated prior to any breach, and that there was never any subsequent enforceable agreement.

The Court addressed and overruled certain of Debtor's objections to the claim (*see* Opinion, ECF No. 100) and conducted an evidentiary hearing on the remaining objections – namely contesting the enforceability of the alleged sales agreement and settlement agreement and contesting the amount of the claim. Over the course of the hearing four witnesses testified: Michael Ryan, Debtor's principal and sole owner; Jeffrey Adleman, the principal of BSS; John Nelson, former counsel to Debtor; and Rodney Kimes, former counsel to BSS. Following the hearing, the parties filed post-trial memoranda. (ECF Nos. 129, 133, 135.)

## II. JURISDICTION

Section 502 of the Bankruptcy Code provides for allowance and disallowance of claims against the bankruptcy estate. Such matters are designated core

proceedings by 28 U.S.C. § 157(b)(2)(B).[1] Additionally, bankruptcy courts have constitutional authority to enter final orders on claims objections. *In re Yellow Cab Affiliation, Inc.*, 659 B.R. 586, 592 (Bankr. N.D. Ill. 2024) (citing *Stern v. Marshall*, 564 U.S. 462, 499 (2011)). The parties also indicated their consent to the authority of this Court to enter final orders and judgments in this proceeding. (ECF No. 109.)

## III. FINDINGS OF FACT[2]

Giving due weight to the evidence admitted, including the stipulations of the parties, the exhibits received and testimony presented, and taking judicial notice of the docket in this matter, the Court finds as follows.

The Lot is a single piece of real estate located at 231 Blackhawk Boulevard in South Beloit, Illinois. It consists of 3-1/2 acres of land adjacent to railroad lines, on which two storage buildings stand. Debtor owns no other real estate and currently leases out space on the property for $650 per month. The parties stipulate that the Lot has a current fair market value of $125,000.

In late 2019, Mr. Adleman expressed interest on behalf of BSS in purchasing the Lot and building additional storage facilities on it. At that time, Debtor was encountering financial difficulties in connection with the property. It was behind on paying property taxes and the City of South Beloit had sued it, seeking the demolition

[1] This matter does not involve any personal injury or wrongful death claims. *See* 28 U.S.C. § 157(b)(2)(B) (excepting liquidation or estimation of such matters).

[2] The following findings, together with those set out in the "Discussion" below, set forth the Court's findings of fact and conclusions of law as required by Fed. R. Civ. P. 52(a) and Fed. R. Bankr. P. 7052. To the extent any findings of fact constitute conclusions of law, they are adopted as such, and to the extent that any conclusions of law constitute findings of fact, they are adopted as such.

of a third building (since torn down) that it deemed hazardous, and raising other issues about the general maintenance of the Lot.[3] Additionally, Debtor apparently was concerned about liability for a potential lawsuit in connection with an unhoused person whose body had been discovered on the premises.

The 2019 Contract. On November 2, 2019, Mr. Adleman, on behalf of BSS, emailed Mr. Ryan a form "Contract for Purchase and Sale" offering to purchase the Lot for $35,000. The document did not require a down payment or earnest money but stated that the proposed contract was to be accepted by 5:00 p.m. on November 7, 2019, and imposed a deadline that the transaction close "on 12-15-19 or on such date as mutually agreed by the parties in writing." Adleman's note described the attached document as "the offer to purchase." The proposed agreement referenced an "attached" legal description although none apparently was. Instead, the email mentioned that Adleman would send the legal description after he received "this info from the lawyer."

Ryan signed the form agreement on behalf of Debtor and returned it to Adleman via email on November 7, 2019, at 11:21 p.m. However, Ryan had struck several provisions from the document: Inspection (lines 46-54), Seller Warranty (lines 144-156), Water System Evaluations (lines 157-173), and Hazardous Substances (lines 174-180). Ryan's November 7 email stated, "As we agreed . . . Jeff should add initials to line 242." The reference to Line 242 pertains to an "Optional Standard Clause," applicable "only if initialed by all parties," and which contains the following

[3] Illinois 17th Judicial Cir. case no. 2019-MR-29 (the "South Beloit Case").

description of the proposed sale: "As Is. Buyer accepts the premises in all respects in 'AS IS' condition as of date of Contract and waives the provisions of Paragraph 12 hereof."

Ryan concluded his email with the following: "per my conversation with Jeff, I have left the close date unchanged. But, we will agree to close expeditiously as it should not take more the [sic] 4 days or so to finish the title search. I would really like to target 11/15." He also stated that he understood that the "title company, will prepare the title or deed for conveyance and set up the title insurance for the closing," and that "[t]hey will also prepare the tax payments." Adleman responded by initialing the "As Is" provision and returned the signed document to Ryan by email on November 13, 2019.[4]

The November 2019 Contract states: "Buyer will furnish written verification of funds to close from a financial institution within 10 business days of acceptance of this Contract." It recites that "Time is of the essence of the terms and conditions of this Contract" and that the "document represents the entire agreement." Listing the email addresses for Ryan and Adleman, the agreement requires notices to be in writing and served directly by personal delivery, regular or express mail, fax machine or email to the addresses listed. The document states that the "Contract shall be deemed effective only upon delivery to the other party, as provided for notices." Paragraph 7 of the agreement states: "Except as otherwise provided, if any contingency cannot in good faith be carried out, this Contract shall become void and

[4] A copy of the fully executed version of the contract is included as an attachment to the email in Exhibit 6 received at trial and is referred to hereinafter as the "November 2019 Contract."

the earnest money shall be returned to Buyer." Paragraph 8, entitled "Closing," provides:

> This transaction shall be closed on 12-15-19 or on such date as mutually agreed by the parties in writing, and Seller shall deliver possession of the premises . . . at time of closing. . . . A final inspection of the real estate . . . may be made by Buyer within 48 hours prior to closing to determine whether the premises is in the same condition as of the time Buyer entered into the Contract.

It is not disputed that BSS did not inspect the premises or request an inspection within the 48-hour period prior to the closing date.

One of the Optional Standard Clauses initialed by both Ryan and Adleman states: "Survey Rider is incorporated by reference." The contract, however, makes no other reference to the term "survey." The parties do not dispute that a survey rider was never prepared.[5]

On or about November 15, 2019, Title Underwriters Agency issued a commitment for title insurance in favor of BSS in the amount of $35,000. Its title commitment listed a number of requirements to be met before it would issue the policy, including payment of all premiums and charges for the policy, providing satisfactory documentation showing payment and redemption of the 2017 and 2018 sold property taxes, payment and release of South Beloit's notice of lien, a court order entered in the South Beloit Case dismissing that litigation and permitting the sale of the Lot and a "satisfactory survey" after which the "legal description will be

---

[5] Ryan testified that he did not "prepare a survey rider" because he "thought Jeff was doing it." (Tr. 69:9-13.) He further testified that "Nobody produced" the "survey rider that was supposed to be attached to the contract." (Tr. 78:6-15.) Adleman testified that Ryan never "produced a survey rider with regard to this contract," which is consistent with no rider ever being prepared. (Tr. 126:7-9.)

amended." As to that last item, the title commitment notes "[d]imensions appear to be different from the adjoining property along the Southerly and Easterly lines."

Adleman sent Ryan an email on or about December 4, 2019, in which he mentions the issues raised by the title company and asks Ryan to pay for a survey. Ryan responded that he was not required to do so, asserting such requirement is inconsistent with the agreement to sell the Lot "as is." In order to – in Adleman's words – "just get it taken care of," Adleman later agreed to pay for the survey. However, he did not obtain one until at least 2023.[6]

South Beloit Case. On November 18, 2019, the state court entered an order finding the defendants had stipulated that the "northwest building" on the Lot "is dangerous and unsafe and beyond reasonable repair." The order allowed Debtor until February 16, 2020, to obtain necessary permits and demolish the building and remove an inoperable motor vehicle and debris. The court further ordered Debtor to reimburse the city $1,675.00 for costs associated with the case. Debtor was directed to mow the Lot and "enjoined from selling the property to any other party until demolition and remediation and reimbursement of $1,675.00 has occurred."

The December 15, 2019, deadline set by the November 2019 Contract passed without a sale. The parties never reached an agreement to extend the contract's time limit.

[6] *See* Tr. 147:4-11. A title commitment that BSS obtained on or about May 15, 2023, still referenced the need for a survey as an outstanding issue and requirement. (Ex. 11.) BSS's former counsel testified that as of May or June 2023 they still "had the survey issue, and we were having a hard time getting the survey done" but that on an unspecified later date "we got the survey done." (Tr. 226:12-18.)

BSS Brings an Action for Specific Performance. On February 7, 2020, BSS brought a lawsuit for specific performance against Debtor and Ryan in Illinois' 17th Judicial Circuit, case no. 2020-CH-85 (the "Specific Performance Case"). BSS alleged it was ready, willing and able to perform its obligations, but the defendants had "failed and refused to complete the transaction and close the sale." Its prayer for relief requests an order requiring Debtor to transfer the Lot to BSS. With its complaint BSS attached a copy of the earlier version of the November 2019 contract. The attached document, however, did not show the "As Is" clause initialed by Adleman. Debtor and Ryan answered the complaint on October 4, 2021, denying most of the material allegations and asserting several affirmative defenses.[7]

In the meantime, Debtor had hired a demolition company and the building identified in the South Beloit Case order was demolished in February 2020. Debtor had not paid that company for its services as of the petition date and its charge was scheduled in this case as an unsecured claim. Debtor paid the $1,675 owed to the city sometime before February 20, 2020.

The November 2020 Proposal. BSS and Debtor continued to discuss the possibility of selling the Lot while the Specific Performance Case remained pending. On November 13, 2020, Adleman signed another proposed agreement prepared by his counsel (the "November 2020 Proposal"). In it, BSS raised its purchase offer to

[7] The defendants had apparently filed a motion to dismiss the complaint, which was pending for a significant period, but the parties have provided this Court few details about that and other facts concerning the state court litigation. Ryan testified generally that, "All the ongoing litigation was basically, like, status hearing every six weeks or something, and they just kept punting it down the road." (Tr. 90: 5-8.)

$75,000 ($0 earnest money) and set deadlines for acceptance and closing of November 20 and December 31, 2020, respectively. The November 2020 Proposal required buyer and seller to split the cost of a survey of the property and did not select any of the optional standard clauses and, therefore, did not provide for the sale to be "as is."

This offer was somehow conveyed to Debtor. But the evidence shows that Debtor never signed or accepted it, instead responding with a one-page document entitled "Counter-Offer" which stated that it had to be "[a]ccepted or countered by January ___, 2021." While Debtor's Counter-Offer accepted most of the terms of the November 2020 Proposal, it required BSS to deposit 3% earnest money with Debtor's attorney and the Lot be sold "As Is" with "absolutely no warranties or even representations, of any kind as to the condition of the property." In addition, the Counter-Offer provides that BSS was solely responsible for any necessary surveys, inspections, certificates, authorization or governmental permission for use of the property, and set a closing deadline of March 15, 2021.

That deadline, too, came and went. BSS did not accept the Counter-Offer by the deadline. Instead, its attorney emailed Debtor's counsel on April 28, 2021, stating that while BSS was "obviously aware of your counter-offer" it required additional information "[b]efore we can comment meaningfully to the counter-offer." This message ended with a suggestion: "If we are unable to resolve these issues, I suggest that we simply set the matter on for a briefing schedule to address your motion to dismiss and move on with the proceedings." The parties apparently continued to

communicate about the Lot over the course of the following months but it appears they made little progress while the state court proceedings continued.

Outstanding Property Taxes. On October 21 or 22, 2021, BSS paid the outstanding property taxes on the Lot, $24,485.66, to redeem the property from tax sale. This appears to have been at the sole initiative of BSS, which had not been asked by Ryan nor anyone else on behalf of Debtor to make this payment. Somehow learning of past-due property taxes, Adleman stated he was concerned that Debtor "was going to lose" the Lot if the taxes were not soon paid. He provided his attorney a cashier's check for the necessary amount, instructing him to deliver it to the tax assessor. Ryan testified that he was surprised when, sometime later, he called the treasurer about what amount was due, only to learn the taxes had already been paid.

Developments in the Specific Performance and Purported Settlement. BSS seems to have filed a "Motion to Enforce Settlement Agreement" in the Specific Performance Case in early May 2023.[8] BSS attached to its motion the November 2020 Offer, never signed by Debtor. In its papers, BSS alleged that "the parties entered into" it on an unspecified date, a "closing was scheduled on December 6, 2022," for which BSS "was ready willing and able to close" and the "Defendant has failed to close." If a closing was set in December 2022, it was arranged unilaterally by BSS

[8] The copy of that motion which BSS offered as an exhibit bears no filing stamp and no testimony was presented as to the specifics of its filing in the Specific Performance case. Nonetheless, the Debtor did not object to the exhibit's receipt. Whether and when the item was actually filed is unknown because it bears no filing stamp. The record does reveal that the defendants in that case, including the Debtor, filed an opposition to the motion on November 2, 2023, so the motion was presumably filed sometime before then.

without the consent of Debtor.[9] Apparently, BSS unilaterally set another closing for June 19, 2023. Again, Debtor did not agree, and the closing never occurred.[10]

On November 2, 2023, Debtor and Ryan filed their response in opposition to the Motion to Enforce Settlement Agreement, alleging that they never accepted or entered into a settlement agreement. This Court finds that it has not been shown that the parties entered into an agreement settling the Specific Performance Case or, with the exception of the November 2019 Contract, that they had entered into any binding agreement regarding sale of the Lot.

Debtor filed its petition under chapter 11 of the Bankruptcy Code on January 26, 2024, which stayed the Specific Performance Case proceedings.

---

[9] Ryan testified credibly that at least prior to May 2023 he never personally agreed to schedule a closing for the Lot because, in his words, "We hadn't resolved any of the issues." (Tr. 43:24 – 44:8.) The "prior to May 2023" qualifier was in the question asked him at trial and he was never asked a follow-up question as to after that period. However, no credible evidence was presented that he agreed to schedule a closing afterwards, either.

[10] At trial BSS presented copies of two emails not previously disclosed on its exhibit list and designated at trial as Creditor's Exhibit A and Creditor's Exhibit B. BSS argued that they should be allowed as "rebuttal exhibits," offering as explanation that Ryan "gave testimony that there was no closing date, no closing time, no – no settlement statement, sometimes referred to as a HUD statement. And so we believe that Creditor Exhibit A rebuts that." (Tr. 241: 2-7.) Exhibit A is a June 19, 2023, email from a title company representative to Adleman's prior attorney and Ryan's prior attorney, stating "We are all set to close this transaction at 1:00 today. The closing statement has been emailed and is ready for final approval." Attached is a proposed ALTA Settlement Statement dated and calculated as of December 6, 2022, more than six months earlier. Exhibit B is an email from Adleman's former counsel to Ryan's former counsel stating, "My client and I are ready, willing and able to close. You have informed me that your client does not wish to close this transaction. Due to your client's unwillingness to close I do not plan on formally attending closing today. It would be a waste of time and money for me to formally appear at the closing when your client is unwilling to close. If this letter misstates your client's position, please advise immediately." Ryan's testimony regarding not seeing proposed settlement statements or closings not being scheduled was in the context of earlier timeframes than December 2022 or June 2023, and therefore is not inconsistent. (*See, e.g.*, Tr. 100:16-17 (asked about "prior to the specific performance action being filed").) In any event, neither Exhibit A nor B show that the Debtor had agreed to sell the Lot or was even involved in the scheduling of any closing, and to the contrary provide further evidence that he had *not* agreed to any closing in December 2022 or June 2023 and that no such closings were actually held. Accordingly, Exhibits A and B will be received, but do not support BSS's arguments.

## IV. DISCUSSION

Under Illinois law, "a plaintiff suing for breach of contract must prove: (1) the contract existed, (2) the plaintiff performed the conditions precedent required by the contract, (3) the defendant breached the contract, and (4) damages." *Smart Oil, LLC v. DW Mazel, LLC*, 970 F.3d 856, 861 (7th Cir. 2020). A condition precedent "is one that must be met before a contract becomes effective or that is to be performed by one party to an existing contract before the other party is obligated to perform." *Id.* When interpreting a contract the court shall "give effect to the intention of the parties as expressed in the agreed terms." *Id.* at 865. The "first and most reliable indicator of the parties' intent is what the parties wrote." *Id.*

Termination of the November 2019 Contract. BSS claims that Debtor "breached" the November 2019 Contract when it informed the creditor that it "would not attend" the closing BSS had scheduled "for June 19, 2023." By then, BSS alleges, it had "resolved" certain issues and stood "ready, willing, and able to close." (Post-trial Brief, ECF No. 133 at 12.) However, the November 2019 Contract had already terminated by its own terms when the parties did not complete certain conditions to sale and close the transaction by the deadline stated in the contract, December 15, 2019.

This case bears some similarity to *Creyts Complex, Inc. v. Marriott Corp.*, where the Seventh Circuit affirmed the district court's finding that "the agreement had expired by its own terms prior to the breakdown of negotiations and, thus, that neither party could succeed on their claim because there existed no enforceable

contract at the time of the alleged breaches." 98 F.3d 321, 322 (7th Cir. 1996). The agreement contained a deadline for the transaction to close and required that the parties agree in writing to extensions or amendments. The trial court in *Creyts* enforced the agreement by its terms, rejecting the argument that evidence of further negotiations or efforts to address difficulties with fulfilling conditions necessary for closing constitutes an enforceable implied (or parole) agreement to extend the deadline. Rather, the court found the matter was "simply a case where two parties were negotiating an amendment to a contract concerning the contract's duration, and the negotiations deteriorated and broke apart." *Id.* at 324.

Similarly, here, the November 2019 Contract required BSS to provide written verification of funds to close from a financial institution by November 27, 2019, and required the transaction to close by December 15, 2019, unless otherwise agreed by the parties in writing. Neither of these events occurred by their respective deadlines.

Although *Creyts* involved the application of Wisconsin law, Illinois courts also recognize that parties "to a contract are free to include any terms they choose, as long as those terms are not against public policy and do not contravene some positive rule of law." *Prime/Mansur Inv. Partners, LLC v. Phx. Office, LLC*, 409 Ill. App. 3d 1161 (Ill. App. Ct. 2011). When the contract is clear and unambiguous a court generally "will not add terms to reach a result more equitable to one of the parties." *Id.* In *Prime/Mansur*, the court noted that the defendant "was under no obligation to continue to facilitate" negotiations after the contract's closing deadline had passed, rejecting evidence of the defendant's general statements that it "would like to get the

deal 'off its books at year end' . . . [as] mere accommodations, unsupported by additional consideration" and not a waiver of the closing date or a modification to the agreement. *Id.* Similarly here, even if the parties continued after December 2019 to address obstacles to closing the sale imposed by the restrictions of the South Beloit Case order and the need to obtain surveys and satisfy other conditions for issuance of the required title policy, such acts do not constitute a waiver or extension of the express terms and conditions of the November 2019 Contract. The parties were free to continue to pursue a sale of the Lot. But the evidence presented does not demonstrate that they subsequently entered into an enforceable agreement for the sale of the property.

The November 2019 Contract is not ambiguous. It requires that closing take place on December 15, 2019, unless the closing date is modified by mutual agreement by the parties in writing. While the evidence suggests that Debtor might have been agreeable to an earlier date, no evidence was presented that Debtor agreed in writing to extend the deadline for closing. Ryan's email to Adleman dated November 7, 2019, which attached his signed offer, indicates that although Ryan did not change the close date, "per my conversation with" Adleman "we will agree to close expeditiously, and "would really like to target 11/15." (Ex. 6.) Adleman raised no issue with that comment or with the contract, and instead initialed and returned the final November 2019 Contract to Ryan.

The importance of the closing deadline is further highlighted in paragraph 18 of the November 2019 Contract, which states that "Time is of the essence of the terms

and conditions of this Contract." "Parties to a contract may make 'time is of the essence' a provision of the contract," meaning that performance by one party at the time or within the time frame specified in the contract is essential to enable him to require counter-performance by the other party. *Elda Arnhold and Byzantio, L.L.C. v. Ocean Atl. Woodland Corp.*, 284 F.3d 693, 699 (7th Cir. 2002) (quoting *Maywood Proviso St. Bank v. York St. Bank & Tr. Co.*, 252 Ill. App. 3d 164, 169 (1st Dist. 1993)). The Seventh Circuit has explained:

> When analyzing the materiality of a time-essence clause, the factfinder initially must ask whether performance by a particular date was truly of such significance that the contract would not have been made if the provision had not been included. A negative answer to this initial question means that the clause did not meet the materiality test and that the breach was minor, provided that the party has completed performance within a reasonable period of time.

*Id.* at 700.

The evidence reveals that the timely closing was important to the seller. Ryan credibly testified that the reason Debtor agreed to sell the Lot in November 2019 was that it "needed the money as soon as possible" and was "in dire straits." He also credibly testified that he believed Adleman was aware of his situation. (Tr. 64:22 – 65:4.) Debtor was in the midst of the City of South Beloit litigation which resulted in Debtor being ordered to pay charges and costs. As described by Ryan, the cash strapped Debtor "didn't have sufficient income at the time to pay the taxes, because we were spending on the legal fees with the city." (Tr. 81:12 – 82:5.)

Nor is this a matter of an inconsequential delay. It is not disputed that BSS did not provide the required written verification of the funds to close from a financial institution within 10 business days from the acceptance of the agreement as required

by paragraph 4 of the agreement. When asked if he or anyone affiliated with BSS provided the written verification of funds, Adleman responded, "I don't remember doing it." (Tr. 140:22 – 141:2.) He testified further that he was not aware of anything to show he provided verification of funds at any time. (Tr. 141:3-7.) Instead, Adleman stated that he, on behalf of BSS, and Ryan, on Debtor's behalf, continued to discuss a potential sale "long after November 7th, 2019." (Tr. 141:8-12.) However, nothing was presented to demonstrate a written, or even oral, extension of the December closing deadline in the November 2019 Contract. Ryan's testimony that he never agreed to anything in writing extending the closing date (Tr. 28:1-3) stands uncontroverted. While Adleman claims that he did not "have any understanding as to why the matter did not close," (Tr. 128:9-11), he testified that in late 2019 he did not attempt to reschedule the closing, (Tr. 144:4-14).

The Court finds that the November 2019 Contract was never extended or readopted. Rather, the agreement terminated by its own terms. The parties may have continued to discuss a potential sale to BSS following the expiration of the closing date, but they were not shown to have entered into an enforceable contract after the November 2019 Contract terminated.

The November 2020 Offer. The May 2023 "Motion to Enforce Settlement Agreement" BSS filed in the Specific Performance Case asserted that "pursuant to settlement agreement the parties entered into" the November 2020 Offer, even though it was never signed by Debtor. BSS does not raise this argument in its post-trial brief (ECF No. 132), and the Court finds the argument waived. *See, e.g.,*

*NorGUARD Ins. Co. v. MB Real Est. Servs., Inc.,* No. 22 CV 3007, 2025 WL 3098214, at *10 (N.D. Ill. Nov. 6, 2025) (matters not raised in post-trial brief deemed waived); *M.G. Skinner & Assocs. Ins. Agency, Inc. v. Norman-Spencer Agency, Inc.*, 845 F.3d 313, 321 (7th Cir. 2017) ("Perfunctory and undeveloped arguments are waived, as are arguments unsupported by legal authority." (citing *United States v. Hook*, 471 F.3d 766, 775 (7th Cir. 2006))). Even were it not waived, however, it is factually unsupported. Rather than accept the offer or sign the proffered contract, the evidence shows Debtor responded by sending a counter-offer in January 2021. (Ex. 12.) That counter-offer required acceptance by the end of January 2021 and mandated the transaction close by "no later than March 15, 2021." (*Id.*) In an April 28, 2021, email to Debtor's former counsel, sent well after the closing deadline in the counter-offer, BSS's former counsel refers not to an agreement but to Debtor's "counter-offer." (Ex. 8.) BSS did not accept the counter-offer in the email. Instead, it raised additional issues and questions, going so far as to anticipate that the litigation will proceed "if we are unable to resolve these issues." (*Id.*)

BSS did not present evidence of a settlement agreement signed by Debtor. Indeed, it fails to credibly explain why, if the parties had indeed entered into a binding settlement agreement in November 2020, BSS waited more than two years after commencing its lawsuit for Specific Performance to file its motion to enforce the agreement in May 2023. Debtor, on the other hand, credibly disavows making such agreement. Ryan testified that he was unaware of any settlement (Tr. 89:13-16) and when shown the unsigned contract attached to the motion filed in the state court,

Exhibit 7, testified that Debtor "wouldn't have accepted it, because it had conditions [and] wasn't checked 'as is,' and there were conditions as an addendum at the back." (Tr. 38:11-13). The attachment to Exhibit 7, the written document that BSS relies on to suggest the existence of a settlement agreement, appears to be merely another version of a sales proposal with "on or before 12/31/20" included for the closing date, and which bears the signature of only the putative purchaser BSS. The document is not signed by Debtor. The document provides, however, that it is only effective after execution and delivery by all parties, stating that, "Following execution by the last party, this Contract shall be deemed effective only upon delivery to the other party, as provided for notices in the preceding paragraph." (Ex. 7.) No such fully-signed agreement was produced by BSS.

"Under basic principles of the law of contracts, even if parties agree, point by point, on all the terms of a contract, if they understand that the execution of a formal document shall be a prerequisite to their being bound –as opposed to it being merely a memorialization of the parties' bargain – there is no enforceable contract until the document is executed." *Nomanbhoy Family Ltd. P'ship v. McDonald's Corp.*, 579 F. Supp. 2d 1071, 1095 (N.D. Ill. 2008) (citing *PFT Roberson, Inc. v. Volvo Trucks N. Am., Inc.*, 420 F.3d 728, 731 (7th Cir. 2005). Until then each party is "free to walk away." *Id.* Nor can BSS argue for the existence of an enforceable oral "settlement agreement" for the sale of the lot. Parol agreements for the sale of land are generally

unenforceable under the Statute of Frauds. *Lopez v. Castro*, 2025 IL App (1st) 231536-U, ¶ 22.[11] BSS does not argue otherwise.

In place of an executed written settlement agreement for the sale, BSS offers the written comments contained in an August 24, 2022 letter from Debtor's former counsel to BSS's former counsel. That letter reads:

> This letter follows up our telephone conversation from this morning. First, the court status date on settlement is set for October 26, 2022 at 9:30 a.m. as we agreed. Second, we both agree that the closing on this property should be effectuated prior to that date. You indicated you had directed your client to obtain the survey, and you believed he had ordered it. Can you confirm that is so?
>
> My client and I are anxious to close the book, chapter, verse and file on this matter. In addition, your client has back taxes paid in a substantial amount I am sure he is anxious to resolve.
>
> Please let us know when we can get a time and date for closing. Since you have already got a title commitment, I gather we will close at the same title company. I will need to obtain a POA from my client to close. I will get a Deed to him to sign and notarize and have it at closing.
>
> If there are any hiccups, please advise as well.

(Ex. 7.)

It is evident that the letter itself is not an operative part of any agreement. Nothing in it presents an offer, acceptance, modification or even description of terms. At best, Debtor's attorney's references to scheduling "the closing" might tend to corroborate the possible existence of some earlier understanding. But the letter provides no information about its material terms. Indeed, it does not even make any reference to the November 2020 Offer or Debtor's January 2021 counter-offer. While

[11] *See also, e.g.*, 740 ILCS 80/2 (no action upon contract for the sale of lands unless "such contract or some memorandum or note thereof shall be in writing, and signed by the party to be charged therewith, or some other person thereunto by him lawfully authorized in writing, signed by such party").

reviewing and summarizing the letter at trial, Mr. Nelson offered that the "purpose of the letter appears to be that we had a closing set for October 26, 2022, at 9:30 a.m." (Tr. 180:2-4.) But he appears to misread his own letter which in fact indicates that October 26, 2022, at 9:30 a.m. is the date and time for a status hearing in the Specific Performance Case, not the date for closing.[12] In context, Ryan testified credibly that his attorney did not discuss or provide the August letter to him and that he "was not aware that there was, like a settlement or anything like that." (Tr. 87:2 – 89:16.)

Even were the Court to accept BSS's suggestion that the August 2022 letter evidences some form of understanding to sell the Lot, the letter suffers the same problems as the November 2019 Contract. While the letter states that "we both agree that the closing on this property should be effectuated prior to [October 26, 2022]," it then lists items that must be completed if the parties are to proceed to close on the sale. When asked whether he "set a time and date for closing with [Debtor's counsel]," BSS's counsel testified that he thought "we were working on that, but then we had the survey issue, and we were having a hard time getting the survey done." (Tr. 226:12-16.) Although he testified that "once we got the survey done, then we set it for closing," he did not elaborate when that survey was completed. A title policy commitment issued May 16, 2023, still references the survey and legal description to be outstanding issues as of that date. (Ex. 11.) It is also undisputed that no closing was scheduled or completed prior to October 26, 2022.

[12] Which, the letter goes on to say, "should be effectuated prior to" the hearing. (Ex. 7.)

BSS also points to a January 13, 2023, letter from Debtor's former counsel to a Winnebago County Assistant State's Attorney, which attached a draft motion that Debtor's counsel prepared but never filed. (Ex. 7.) The draft motion identifies an "Order in Winnebago County Case No. 2021-TX-0000150 as a cloud on the title" of the Lot. The letter states counsel would have asked the court "In the Matter of the Application of the County Collector For Order of Judgment and Sale Against Lands and Lots Returned Delinquent for Non-Payment of General Taxes for the Year 2017" to "correct the record" to reflect that the "property tax bill of $24,485.66 was paid prior to the deadline for redemption." (*Id.*)

BSS suggests that a statement that the Specific Performance Case "is ready to finally settle contingent on the closing or the transfer of" the Lot" found in the draft motion supports the inference that the parties had entered into an enforceable settlement agreement. Although Debtor did not object to the admission of the exhibit, this Court puzzles over its relevance. No proof was presented that it had been presented to the state court or whether it had even been filed. Is it also plausible that the lack of evidence of what became of the draft motion suggests the parties did not reach a settlement agreement? As with the August 2022 letter, even were the statements in the draft motion assumed to corroborate the existence of an agreement, the letter fails to identify what that agreement is or its terms. Furthermore, the letter highlights that the tax court order remained another obstacle to closing a sale of the Lot as late as mid-January 2023. At best it might indicate some optimism on the part of Debtor's former counsel as to the possibility of reaching settlement – a possibility

existing some months after the state court's scheduled October 26 hearing on settlement. Even allowing such a liberal construction, the draft motion does not admit to the existence of an enforceable contract.

Equitable Estoppel. Finally, BSS asserts "Equitable Estoppel Bars the Debtor From Disavowing Liability After Inducing and Accepting Reliance Performance," as BSS styles the argument in its post-trial brief. (ECF No. 133.) While difficult to follow, this argument focuses on BSS's October 2021 payment of $24,485.66 in delinquent real-estate taxes to assert that it should be entitled to a claim of expectancy damages in the amount of $116,116.42.

Under the doctrine of equitable estoppel, "where a person has said or done something, and another party has reasonably and detrimentally relied upon that statement or conduct, the person cannot deny it." *Patrick Eng'g, Inc. v. City of Naperville*, 2012 IL 113148, ¶ 35 (citing *Geddes v. Mill Creek Country Club, Inc.*, 196 Ill. 2d 302, 313 (2001)). A claim of equitable estoppel exists "where a person, by his or her statements or conduct, induces a second person to rely, to his or her detriment, on the statements or conduct of the first person." *Sosa v. Onfido, Inc.*, 8 F.4th 631, 641 (7th Cir. 2021) (quoting *Ervin v. Nokia, Inc.*, 349 Ill. App. 3d 508 (2004)). The party bringing an equitable estoppel claim "must have relied upon the acts or representations of the other and have had no knowledge or convenient means of knowing the facts, and such reliance must have been reasonable." *Id.* The party claiming equitable estoppel "has the burden of proving it by clear and convincing evidence." *Id.* (quoting *In re Scarlett Z.-D.*, 2015 IL 117904, ¶ 26.

As "*a general principle*, the doctrine of equitable estoppel, like other principles of equity, will be applied flexibly by a federal court to achieve fairness and avoid injustice." *Hartford Fire Ins. Co. v. Henry Bros. Constr. Mgmt. Servs., LLC*, No. 10-cv-4746, 2011 U.S. Dist. LEXIS 88718, at *27-28 (N.D. Ill. Aug. 10, 2011) (quoting *Jennings Water, Inc. v. City of N. Vernon, Ind.*, 895 F.2d 311, 316 (7th Cir. 1989)). A party invoking the doctrine against another must show that:

> (1) the other person misrepresented or concealed material facts; (2) the other person knew at the time he or she made the representations that they were untrue; (3) the party claiming estoppel did not know that the representations were untrue when they were made and when that party decided to act, or not, upon the representations; (4) the other person intended or reasonably expected that the party claiming estoppel would determine whether to act, or not, based upon the representations; (5) the party claiming estoppel reasonably relied upon the representations in good faith to his or her detriment; and (6) the party claiming estoppel would be prejudiced by his or her reliance on the representations if the other person is permitted to deny the truth thereof.

*Orlak v. Loyola Univ. Health Sys.*, 228 Ill. 2d 1, 21-22 (2007) (quoting *DeLuna v. Burciaga*, 223 Ill. 2d 49, 82-83 (2006)).

It is not clear from BSS's brief what misrepresentation(s) or concealed fact(s) it contends occurred that support the application of the doctrine here. None were presented at trial. BSS argues that it suffered detriment on or about October 21, 2021, when it paid the Winnebago County Clerk the $24,485.66 in back taxes due on the Lot. (Ex. 21.) But it does not argue and the evidence does not show that Debtor induced it to do so. Rather, Adleman testified that he "unilaterally went and paid these real estate taxes." (Tr. 153: 16-21.) Explaining that he was concerned Ryan "was going to lose" the Lot if the taxes were not paid soon, Adleman recounted that he obtained a cashier's check and had his attorney deliver it to the tax assessor. (Tr.

132:19 – 133: 18.) Adleman did not testify how he learned about the unpaid taxes, and BSS does not allege that Debtor told it to pay them. On the contrary, Adelman testified that he did not recall ever discussing the unpaid tax issue with Ryan or anyone involved with Debtor. (Tr. 153:9-15.) Consistent with this, Ryan testified that he never asked Adleman or anyone affiliated with BSS to pay the real estate taxes and was surprised to hear the taxes had already been paid when he called the treasurer's office to inquire about the amount that needed to be paid. (Tr. 45:19-25, 46: 21-25.)

BSS claims a provision in the November 2019 Contract supports its equitable estoppel theory for the tax payment claim. Paragraph 9 of the contract provides: "Rents, utilities, pre-paid service contracts, property taxes, association dues, and other similar items shall be prorated and credited along with security deposits and prepaid items through date of closing." But that term does not *require* the buyer to pay past-due real estate taxes. BSS does not suggest such term is found elsewhere in the document. It makes little difference if it did because the November 2019 Contract had long since terminated before BSS paid the taxes in October 2021.

Nor has BSS explained, let alone demonstrated, that its claim for the appreciated value of the Lot should be allowed under the doctrine of equitable estoppel. BSS points to evidence of further discussions for the sale of the Lot between Debtor's attorneys and representatives and counsel for BSS after the November 2019 Contract's closing deadline passed. Relying on the evidence of those discussions and related conduct, BSS asserts that Debtor may not stand silently by while BSS

supposedly relied on this conduct of Debtor's agent to argue that Debtor is somehow estopped from denying it was contractually bound to sell the Lot and settle the state court litigation. (ECF No. 133 at 15.) However, as discussed above, the evidence does not demonstrate BSS's reasonable good-faith reliance on a misrepresentation or concealment of material facts. In this case, the actual or apparent authority of Ryan or the various attorneys is not at issue, rather it is what they did on Debtor's behalf. And, for the reasons discussed above, the Court finds that the parties' actions, including the actions of their agents, do not demonstrate that BSS reasonably relied in good faith on their representations or actions to its detriment.

Indeed, allowing BSS its claim for expectancy damages for a contract that had terminated by its own terms or for an alleged agreement that Debtor did not sign would result in an inequitable windfall for BSS. The parties stipulated that the Lot is worth $125,000. BSS calculates its claim to be $90,000 based on "the agreed-upon value of the property and the purchase price found in the terminated 2019 Contract."[13] (EFC. No. 133 at 14.) BSS has not demonstrated misrepresentations or omissions by the Debtor or its agents on which it reasonably relied, nor the other elements for the application of the doctrine here. Accordingly, the Court will find that

---

[13] BSS claims, in the alternative, expectancy damages of $50,000 based upon the parties' alleged "later settlement agreement fixing the stipulated sale price at $75,000." (ECF No. 133 at 14) Its equitable estoppel argument for the lesser alternative sum, nevertheless, rests on the same underlying proof as does the larger and also must be rejected for the reasons discussed above.

the Debtor is not equitably estopped from objecting to Claim 3-2 and its objection is sustained.[14]

While its failure to prove its reasonable reliance defeats the equitable estoppel argument raised by BSS, the creditor is not without any remedy – at least to the extent that there is an allowable claim for the tax payment. Normally *quantum meruit* is the "equitable theory by which a party can obtain restitution for the unjust enrichment of another party." *Friedman & Friedman, Ltd. v. Basic*, 2012 IL App (1st) 112642-U, ¶ 31. To obtain such remedy, the provider of a service "must show that valuable services were furnished by him, that they were received by the defendant, and that the circumstances are such that it would be unjust for the defendant to retain these without paying for them." *Bernstein & Grazian, P.C. v. Grazian & Volpe, P.C.*, 402 Ill. App. 3d 961, 979 (2010). Here, it is not disputed BSS paid the outstanding property taxes on the Lot, $24,485.66, to redeem the Lot from tax sale. Indeed, Debtor identifies an unsecured claim of BSS in that amount in its bankruptcy schedules and provides for payment of that amount in full on the effective date of the plan in its proposed Chapter 11 plan. (ECF No. 32, ¶2.1(B)(2)(B).) While the original Claim Objection sought disallowance of BSS's claim in full, Debtor's counsel made clear at the trial that, in his words:

> Our position, as stated in our objection to claim number three of [BSS], is simply that the debtor does not owe anything to [BSS] in excess of the stipulated amounts for payments of sold real estate taxes in the amount

[14] In addition to the asserted expectancy damages, BSS requests the Court allow its litigation expenses and attorney's fees, attributed to the state court litigation and the "Chapter 11 litigation." *Id.* Having failed to offer legal authority for the allowance of these expenses and fees, beyond its general argument for the allowance of its claim, this request, too, is denied.

> of $24,485.66. And, again, that's been stipulated to. That's been disclosed on the debtor's schedules from day one. And the proposal in the debtor's Chapter 11 plan is to pay that amount in full via lump sum payment upon confirmation of the pending Chapter 11 plan.

(Tr. 10:7-18.) Nor does Debtor dispute that the payment conferred a valuable benefit upon the bankruptcy estate which the estate continues to enjoy. The Court, therefore, finds would be unjust for Debtor to retain this benefit without allowing BSS an allowed claim of $24,485.66 for its property tax payment.

## V. CONCLUSION

Accordingly, Debtor's objection to proof of claim number 3-2 will be sustained and the BSS claim disallowed except for the sum of $24,485.66, which amount is allowed only as an unsecured claim.

A separate order giving effect to these findings and determinations will be contemporaneously entered with this Memorandum Opinion.

DATE: September 24, 2026

ENTER:

/s/ Thomas M. Lynch

Thomas M. Lynch
United States Bankruptcy Judge